**DECLARATION IN SUPPORT OF COMPLAINT FOR FORFEITURE**

Under 28 U.S.C. § 1746, I, Jack Cockrum, a Special Agent with the United States Department of Justice, Drug Enforcement Administration ("DEA") make the following unsworn declaration, under penalty of perjury, in support of the complaint for forfeiture to which this declaration is attached:

## I.   **Introduction**

1.     This declaration is made in support of a Verified Civil Complaint for forfeiture of property seized pursuant to a valid traffic stop.  The Defendant Property is subject to forfeiture under 21 U.S.C. § 881, 18 U.S.C. §§ 981(a)(1)(A) and (C), and 31 U.S.C. §§ 5317 and 5332(c) because the Defendant Property is involved in or constitutes the proceeds of drug trafficking and/or was being transmitted by courier, in violation of 21 U.S.C. §§ 841 (drug trafficking) and 846 (drug conspiracy), 18 U.S.C. §§ 1956(a)(1) (money laundering), 1956(h) (money laundering conspiracy), and 1960 (unlicensed money transmitting businesses), and/or 31 U.S.C. § 5332 (bulk cash smuggling).

2.     This declaration is based upon my personal knowledge and experience obtained as case agent and information I have received from other law enforcement officers.  The information is based on my participation in this investigation and statements made by witnesses, information given to me by other law enforcement officers, the results of physical and video surveillance, review of consensually recorded conversations, law enforcement reports, review of subpoenaed records and information provided to me by non-law enforcement personnel.

**EXHIBIT A**

3.      Unless otherwise noted, wherever in this declaration I assert that a statement was made, the information was provided by others with whom I have spoken or whose report I have reviewed.  Such statements are not reported in their entirety or verbatim, unless otherwise indicated.

4.      Because this declaration is being submitted for the limited purpose of establishing probable cause that the defendant property is the proceeds of and/or involved in violations of criminal law, I have not set forth every fact learned during the investigation, nor is this declaration intended to be a complete and detailed description of all events and conversations occurring during the investigation.

II.     **Declarant's Background and Experience**

5.      I have been employed as a Special Agent with the DEA since January 2020 and am currently assigned to the Gulfport Resident Office ("GRO") located in Gulfport, Mississippi.  I have participated in investigations of illegal narcotics trafficking and violations of the Controlled Substances Act, 21 U.S.C. § 801, *et seq.* Prior to beginning my career as a Special Agent, I completed an 18-week training program at the DEA Training Academy in Quantico, Virginia.  My training has included narcotics investigations, hotel, motel, and parcel interdiction, drug search warrants, financial investigations related to drug trafficking, money laundering, asset forfeiture and seizure, and social media analysis.  I have participated in and conducted a multitude of investigations which have led to the arrest and conviction of individuals who have been involved in the smuggling, receiving, and distribution of controlled substances, as well as the seizure of illegal drugs and proceeds derived

**EXHIBIT A**

from the sale of those illegal drugs.  In addition, I have conducted, in connection

with these and other cases, investigations concerning the concealment of narcotics-

produced assets and the identification of co-conspirators through ledgers, telephone

bills and records, and photographs, as related to drug trafficking.  I have been

involved in various types of electronic surveillance, in the writing and execution of

search warrants, and in the debriefing of defendants, witnesses and informants, as

well as others who have knowledge of the distribution and transportation of

controlled substances, and of the laundering and concealing of proceeds from the

trafficking of controlled substances.

      6.     Based upon my training, experience, shared experience with other

agents and officers with whom I have worked, and participation in drug trafficking

and financial investigations, I know the following:

    a.    That criminal organizations, including drug-trafficking organizations ("DTOs"), maintain and handle large amounts of United States currency in order to finance their ongoing illicit businesses;

    b.    That it is common practice for large-scale drug traffickers to secrete contraband, proceeds of drug sales, and records of drug transactions in locations within their residences, vehicles, and/or place of business to conceal them from law enforcement authorities;

    c.    That it is a common practice for large-scale drug traffickers to travel to distribution areas to facilitate their trafficking; that after purchasing drugs, the drug trafficker will transport, or cause to be transported, drugs to other areas for distribution; and that the methods of transportation include, but are not limited to, rental and private automobiles;

    d.    That DTOs solicit drug and/or money couriers, also called "mules," to transport drugs/money—some transporting both, although not usually at the same time—between source cities and distribution cities.  Mules are recruited based on their

**EXHIBIT A**

normal, unremarkable appearance, lack of criminal record, and possession of a valid driver's license to thwart law enforcement detection. Use of mules also limits law enforcement's ability to identify the source of the drugs or money, because using mules allows the source to disassociate themselves from the drugs or money. Mules typically create fictitious stories to explain the purpose of their trip and—if the currency is found—why they are carrying large sums of cash;

e. That money couriers take a percentage—usually approximately 10 percent—of the illegal proceeds that they transport. Some couriers may take a percentage of drugs that have been couriered for them to resell or for personal use;

f. That traffickers use vacuum-sealed bags, aluminum foil, tape and/or rubber bands to bundle their illegal proceeds for transport back to Mexico or source destinations. By vacuum sealing the money, drug traffickers attempt to make it difficult for law enforcement canine units to detect trace amounts of illegal drugs that have touched the drug proceeds and by vacuum sealing and/or using tape to package the proceeds, it condenses the package of bulk currency, allowing it to be more easily concealed. The bundled cash may be concealed in clothing or luggage or hidden in mechanical or electronic traps within the vehicle, depending on the sophistication of the smugglers' organization. When the currency is bundled by rubber bands, it is common for the bundles to be in thousand-dollar increments;

g. That, generally, illegal drugs are transported from Mexico into the United States, while drug proceeds are transported from the United States into Mexico; couriers' vehicles often have a "lived in look" due to long trips with few stops; this "lived-in look" can consist of excessive amounts of fast food wrappers, open and unopened soft drinks or water bottles, energy drinks, an ice chest, etc.;

h. That DTOs commonly pay their couriers based on the type and amount of narcotics and/or the amount of narcotics proceeds transported; because new couriers are not normally trusted with bulk currency or bulk narcotics, if a courier is found in possession of bulk currency or narcotics, it is often an indicator that the courier is well established and trusted within an organization;

i. That couriers for DTOs often use multiple cellular phones, which are often prepaid phones, as they are typically

**EXHIBIT A**

inexpensive and can be easily disposed of and harder to trace to a specific individual. Much like continually changing vehicles and registrations, couriers and drug traffickers believe changing cellular phones will help elude law enforcement;

j.    That money couriers and those with illegally obtained proceeds often attempt to justify their possession of bulk currency by claiming that the currency is the proceeds of legal cash-based self-employment. Such individuals are often unable to substantiate their claims with business records;

k.    That, in addition to the scents of other drugs, drug-sniffing dogs are trained to alert to the smell of methyl benzoate, a compound formed when cocaine hydrochloride hydrolyzes in moist air; and

l.    That the Courts have recognized unexplained wealth is probative evidence of criminal violations by pecuniary gain, in particular trafficking in controlled dangerous substances (*see United States v. Barnes*, 604 F.2d 121, 147 (2 Cir. 1979)).

## III.    Items to be Forfeited to the United States of America

7.    The Defendant Property sought for forfeiture is the **$53,495.00 U.S. Currency (22-DEA-693596)** seized on June 29, 2022, from Jennifer Abshire as a result of a traffic stop on Interstate 10 westbound near Mile Marker 40 in Biloxi, Harrison County, Mississippi.

## IV.    Facts and Circumstances

8.    At approximately 5:13 p.m. on June 29, 2022, Joshua Burks, Task Force Officer ("TFO") with the DEA GRO and a Patrolman First Class with the Biloxi Police Department ("BPD"), observed a black 2020 Chevrolet Spark (referenced hereafter as the "Spark") bearing Colorado license plate ABZF32 traveling approximately 80 miles per hour ("mph") in a 70-mph zone and following too closely behind another car. TFO Burks stopped the Spark near mile marker 40 Westbound, on Interstate 10, Biloxi, MS.

**EXHIBIT A**

9.     TFO Burks approached the Spark's driver and sole occupant, Jennifer Abshire ("Abshire"), identified by her Texas driver's license, which she handed over in addition to a Hertz Vehicle rental agreement showing that Abshire had rented the Spark in Texas on May 31, 2022, to be returned in Texas on July 2, 2022.  TFO Burks observed that Abshire was trembling when she handed TFO Burks her driver's license.

10.     TFO Burks noticed there were several sandwich and food wrappers all over the front passenger seat area, indicating Abshire was eating in the car a lot.

11.     Abshire's facial expressions indicated she was concerned and afraid. She was panting and grabbed her chest with her right hand while taking a deep breath.  Abshire appeared to be overly nervous, and it seemed to be affecting her breathing.  TFO Burks asked Abshire what was wrong.  Abshire began nervously stuttering and stated, "I just, I don't, I try to abide by the law."

12.     While Abshire was looking for her insurance, TFO Burks asked where she was headed, and she told him she was going home.  This was a vague answer, so TFO Burks asked Abshire where "home" was.  Abshire told him "Texas," which is also vague, and he believed she was avoiding his question.  TFO Burks noticed that, according to Abshire's driver's license, she lived in Humble, Texas, a suburb of Houston.  TFO Burks knew that Houston is a large source city for illegal narcotics and destination city for proceeds from illegal narcotics sales and that DTOs use mules who know how to divert from their original activity (smuggling contraband

**EXHIBIT A**

from location to location) and use tactics to stay clandestine. Vague answers about
the origin and destination of the trip is one of these tactics.

13.     TFO Burks asked Abshire where she was coming from, and she told
him she was in Atlanta, which is a large destination city for illegal narcotics.
Abshire then spontaneously stated, "I do OnlyFans."[1] TFO Burks knew that
another tactic mules use is to change the conversation away from topics involving
the details of their trips, so TFO Burks ignored her comment and asked how long
she had been in Atlanta. Abshire responded, vaguely, "a while." TFO Burks
became suspicious that Abshire was transporting illegal narcotics and or money
from the sale of illegal narcotics and asked if there was anything illegal in the car,
which she denied. Abshire also denied that there were any large amounts of U.S.
currency over $10,000 in the car. TFO Burks returned to his patrol unit to run
Abshire's information and write a warning citation.

14.     TFO Burks had Abshire come back to his patrol unit while he finished
the warning citation and so he could explain that she did not have to pay anything
or go to court as result of the warning citation. TFO Burks told Abshire that she
should not follow so close and that she should have about one car length between
her and the car in front of her for every 10 mph of speed.

15.     While writing the warning citation and running Abshire's information,
TFO Burks learned through law enforcement databases that Abshire had crossed

---

[1]  OnlyFans is an internet content subscription service used primarily by sex workers who
produce adult-oriented content, although it also hosts the work of other content creators, such as physical
fitness experts and musicians.

**EXHIBIT A**

the U.S./Mexican border 11 times between January 20, 2021 and April 11, 2022 (eight of those times were on the Progreso International Pedestrian Bridge, a 6-hour drive from Humble, Texas) and that the Spark had been further north than Atlanta.[2] Due to his training and experience, TFO Burks believed with all the combined factors that Abshire was transporting narcotics or currency.

16.     While finishing the warning citation, TFO Burks again asked if there was anything illegal or any large amounts of currency in the car, and Abshire again said there was not.  Abshire verbally granted TFO Burks' request for consent to search the Spark.

17.     During the search, TFO Burks located a suitcase on the front passenger seat.  Inside the suitcase were two plastic bags containing a white powdery substance which appeared to be cocaine (and subsequently field-tested positive for cocaine)—commingled with personal items (including several plastic bags containing assorted pills later determined to be vitamins, supplements, and non-controlled medication)—and a black cloth bag containing a bowl, scale, and multiple small plastic bags containing a gray substance.[3]  Abshire also had a piece of luggage on the rear passenger seat containing miscellaneous underwear, candles, a softball, high heels, and miscellaneous personal items, a gym bag in the trunk

---

[2]  Additionally, although it is approximately 800 miles from Humble, Texas to Atlanta, Georgia and another approximately 388 miles from Atlanta to Biloxi, Mississippi (for a total of 1,188 miles for her purported trip), the Spark had 52,007 miles on it at the time of the traffic stop, a gain of 6,771 miles from the time the vehicle was rented.

[3]  The gray substance could not be identified at Biloxi Police Department and was sent to the state crime lab for further analysis.

**EXHIBIT A**

with a weightlifting belt, gloves, and protein, and a cloth bag in the trunk containing a change of clothes and food items.  The amount of clothing Abshire had was inconsistent with someone making a month-long trip.

18.     While examining the suitcase, TFO Burks felt something under the suitcase liner and looked into the zipper, which was over the extendable handle of the suitcase, and observed a plastic ziplock bag containing cash under the liner. TFO Burks ultimately found a total of four plastic zipper bags containing a large amount of currency under the liner of the suitcase and additional loose money in a suitcase pocket.   Due to Abshire lying about a large amount of money being in the car, the way it was hidden, and the way it was packaged (as well as the other factors previously mentioned), TFO Burks believed the money constituted proceeds from narcotics sales.

19.     TFO Burks walked back to his patrol unit and waited for his back-up unit. While waiting, Abshire asked TFO Burks "what are you guys checking for, compartments and stuff?"  This question further reinforced TFO Burks' suspicion that Abshire knew more about drug trafficking than most civilians.

20.     TFO Burks asked Abshire if she was on a work trip and she said she just went to stay with friends.  He asked Abshire how long she was there and she said "a month and a half" and that she was at "home" before going to Atlanta.  TFO Burks specifically asked if she went from Houston to Atlanta and nowhere else and she said "yeah" and claimed she was returning home along the same route she traveled to Atlanta.

**EXHIBIT A**

21.     Other officers arrived on scene as TFO Burks finished searching the Spark.  Abshire was arrested on suspicion of narcotics possession and put into the backseat of TFO Burks' patrol vehicle.  Coastal Towing removed the Spark from the scene and TFO Burks transported Abshire to BPD and took her to booking.

22.     During the traffic stop, Abshire never claimed or denied ownership of the confiscated U.S. Currency or the narcotics and drug paraphernalia.

23.     The white powder (cocaine) in the two plastic bags weighed approximately 4.5 grams.  The gray substance was not weighed due to it being in multiple small bags, but collectively, they weighed less than 2 grams.  Abshire's phone was processed as evidence.

24.     Using a BPD money counter, TFO Burks and BPD Investigators Matt Boone and Robert Dronet counted the U.S. Currency as totaling $53,495.00.   In a controlled area of the BPD, BPD Officer Jensen and his K-9, Thor, conducted an open-air sniff of the currency, which had been placed in one of 4 identical brown paper bags.  Thor gave a positive reaction on the bag containing the currency, indicating the presence of an odor associated with narcotics on the currency.

25.     BPD Investigator Caleb Gregoire reviewed the evidence at the police department, and conducted a Post-*Miranda* interview with Abshire, who claimed she is a personal trainer and body builder, who gets paid to wrestle men, and that is why she had so much money on her.  Abshire added that in addition to OnlyFans, she is also a nurse.  Abshire also claimed that when TFO Burks had asked her if she bulk currency, she thought he meant "bricks of money" and since the money was

**EXHIBIT A**

her own earnings, she had told TFO Burks that she did not have any large amounts of money.

26.     Abshire then explained that the "stuff," referencing the cocaine, was not hers, but she had an idea on who it belongs to.  Abshire stated that since she tried to travel with little luggage, she removes her prescriptions from their bottles and places them in a bag.  Consequently, Abshire claimed, she thought the white powder was her anxiety medication that broke down, and that she had no idea it was cocaine and did not know where it came from.

27.     Contradicting her statements to TFO Burks about only traveling to Atlanta, Abshire claimed she had been on an OnlyFans and wrestling tour, starting in San Antonio, with stops in Minneapolis, Boston, Fort Lauderdale, and finally Atlanta, and now she was on her way home to Texas.  She estimated that her tour had 25 stops and that she made between $0 and $2,000 per stop.  She did not know how much cash she had on her—and was unable to provide an estimate—and had no business records to corroborate her story, because her clients do not want their information discoverable.

28.     TFO Burks seized the currency as proceeds of drug trafficking, sealed it as evidence and turned it over to the BPD Evidence Technician to be stored for safekeeping pending transport to the DEA GRO.   The drug evidence and narcotics paraphernalia confiscated in connection with Abshire's arrest was also transported and secured in the BPD Evidence Storage Section.

**EXHIBIT A**

29.     Abshire was charged with possession of a controlled substance and transported to Harrison County Adult Detention Center.  Harrison County Justice Court Judge Albert Fountain ordered a $50,000 dollar bond on Jennifer Abshire for the charge of Possession of a Controlled Substance to wit: Cocaine, a violation of MS Code 41-29-139 (C), and, on December 21, 2022, signed a search warrant for Abshire's cellphone.

30.     On June 30, 2022, TFO Jermaine Flaggs and I took custody of the still-officially undetermined amount of U.S. Currency seized by TFO Burks.

31.     On July 5, 2022, TFO Flaggs and I transported the U.S. Currency to The First Bank, located at 1300 25th Avenue, Gulfport, MS, to obtain an official count.  Although the bank's count was originally $52,995.00, after an audit, the bank determined that the count was actually $53,495.00.  On July 8, 2022, The First Bank gave me a cashier's check (#336642) made payable to the U.S. Marshal Service in the amount of $53,495.00.  TFO Flaggs and I transported the cashier's check to the GRO and secured the same in the GRO High-Value Safe for safekeeping pending processing and submission to the U.S. Marshal Service.

32.     Officers did not conduct a K-9 sniff test during the search of the Spark, and no firearms or additional narcotics, currency, paraphernalia, or contraband were seized.  Abshire did not have any known drug-related arrests.  Abshire's employment status is unknown.

33.     Abshire was released on bond from Harrison County Jail on June 30, 2022.  Her state charges are still pending.

**EXHIBIT A**

34.     On September 23, 2022, Abshire filed an administrative claim for the currency through her attorney, Michael W. Crosby.  In her claim, Abshire alleged that the currency was her own "legitimate," "hard-earned money."  As for the drugs, Abshire denied they were hers and stated, "I did not knowingly put them in my suitcase, and I did not agree for the drugs to be in my suitcase."  The DEA referred the case to the U.S. Attorney's Office.

## IV.   <u>CONCLUSION</u>

35.     Based on these findings, I determined that probable cause existed to seize the currency as being illicit proceeds or involved in drug trafficking.  This determination was made by several factors to include: (1) the deceptive behavior exhibited by Abshire, (2) the currency amount being consistent with larger scale distribution amounts, (3) the currency being hidden behind the lining of Abshire's luggage, (4) possession of a large quantity of controlled substances and drug paraphernalia, and (7) the positive alert for controlled substance on the currency by a certified narcotics-detecting K-9.

36.     The results of this investigation support my reasonable belief that the government can meet its burden of proof that the Defendant Property is directly related to and/or derived from the illicit distribution of controlled substances.  This determination was made on the facts and circumstances presented above.

37.     I reasonably believe, based on the above-listed facts and circumstances, that there was probable cause to seize the $53,495.00 U.S. Currency and that the United States will meet its burden of proof to forfeit $53,495.00 U.S.

**EXHIBIT A**

currency.  I reasonably believe that the money was intended to facilitate or used to further a drug crime, or is directly related to drug proceeds of Abshire or her associates, in violation of 21 U.S.C. § 841 (drug trafficking) and § 846 (drug conspiracy), 18 U.S.C. § 1956(a)(1) (money laundering), 18 U.S.C. § 1956(h) (money laundering conspiracy), 31 U.S.C. § 5332 (bulk cash smuggling), and/or 18 U.S.C. § 1960 (unlicensed money transmitting businesses), and is therefore subject to forfeiture to the United States of America under 21 U.S.C. § 881, 18 U.S.C. §§ 981(a)(1)(A) and (C), and 31 U.S.C. §§ 5317 and 5332(c).

38.     I declare, pursuant to 28 U.S.C. § 1746, that the foregoing is true and accurate to the best of my knowledge and belief.

Executed this 22th day of December 2022,

Jack Cockrum
Special Agent
Drug Enforcement Administration

**EXHIBIT A**